**UNITED STATES of America**

v.

**REPUBLIC STEEL CORPORATION, International Harvester Company, and Interlake Iron Corporation.**

No. 54 C 1608.

United States District Court
N. D. Illinois, E. D.

June 19, 1957.

As Amended June 20, 1957.

Decree June 24, 1957.

Robert Tieken, U. S. Dist. Atty., Chicago, Ill., by Alexander O. Walter and Richard C. Bleloch, Asst. U. S. Attys., Chicago, Ill., for plaintiff.

Harold C. Lumb, Cleveland, Ohio, R. Corwine Stevenson, Paul R. Conaghan, of Stevenson, Conaghan, Velde & Hackbert, Chicago, Ill., for defendant Republic Steel Corp.

W. S. Bodman, Wilson & McIlvaine, Chicago, Ill., for defendant International Harvester Co.

Henry E. Seyfarth, Robert W. MacDonald and Walter P. Loomis, of Seyfarth, Shaw & Fairweather, Chicago, Ill., and Benjamin F. Fiery, Warren Daane, and Glenn E. Offenbacher, Baker, Hostetler & Patterson, Cleveland, Ohio, for Defendant Interlake Iron Corp.

BARNES, Chief Judge.

This cause, now before the court for decision after hearing on the merits, was instituted by the United States: (1) to secure an injunction enjoining the defendants, Republic Steel Corporation, International Harvester Company, and Interlake Iron Corporation, from depositing and discharging industrial solids or flue dust into the channel of the Calumet River, a navigable water of the United States, without first obtaining a permit from the Department of the Army providing for suitable and satisfactory conditions for the removal of such deposits and discharges; and (2) to secure a mandatory injunction directing the defendants, and each of them, upon a day certain, by dredging operations or otherwise, to restore the Federal channel of the Calumet River between Stations 105 and 300 to the original channel depth of 21 feet. In its amended complaint the Government alleges that, in 1951, the defendants, upon request of the office of the Chief of Engineers, Department of the Army, paid the costs of dredging the channel of the Calumet River and thereby restored the river to its original depth of 21 feet, and that since the date of the last dredging operation in 1951 the defendants, as an incident to operating their mills located along the banks and channel of the river, have been discharging and depositing industrial solids and flue dust into the channel of the river, thereby reducing the depth of the river, and that such continued discharge and deposit constitute an obstruction of a navigable water of the United States and an interference with and an obstruction to interstate and foreign commerce and injury to the public interest. It is further alleged in the amended complaint that the continued discharge by defendants of industrial solids and flue dust into the Calumet River is unlawful and in violation of Sections 403 and 407, Title 33 U.S.C.A. The defendants deny that they have been discharging and depositing industrial solids and flue dust into the channel of the river which have reduced the channel depth or impaired

the navigability of the river; that, in the event the channel depth has been reduced from 21 feet, such reduction is principally due to the deposit and accumulation in said channel of material from natural causes, and that other companies and industries conducting operations along said river have deposited material therein. The defendants admit that, in 1951, they each shared in the cost of dredging, as alleged by the Government, but they deny that such action constituted an admission that they were obligated to make such payment or to dredge the river in the future. Defendants further contend that their liability, if any, is several only and not joint or joint and several. Republic contends that the Government's claim is barred by the Illinois five-year statute of limitations. S.H.A. ch. 83, § 16. International Harvester states that, since it is willing to remove all material from the river for which it is responsible, if any, when the amount of such material has been properly determined, the injunctional relief sought should be denied.

■■ The court listened to the evidence in this case during 27 court days, and is clearly of the opinion that the evidence established that all of the defendants, in violation of Sections 403 and 407, Title 33 U.S.C.A. have discharged, and are continuing to discharge, industrial solids, not in a liquid state, through their sewers or through their sewers and connecting slips, into the channel of the Calumet River adjacent to their plants, and that such discharges have resulted in reducing the depth of the river channel in the vicinity. The contentions of the defendants that the reduction in depth of the river channel adjacent to their plants is principally due to natural causes or the operations of other industries along the river have not been sustained by the evidence. It therefore appears to the court that the Government is entitled to an order enjoining and restraining the defendants, and each of them, from discharging industrial solids and flue dust into the river in the future without first obtain-

ing a permit from the Department of the Army providing for suitable and satisfactory conditions for the removal of such deposits and discharges, the defendants to be given a reasonable time, not exceeding six months, to comply with such order.

On the question as to whether or not the Government is entitled to a mandatory injunction requiring the defendants to restore the Federal channel of the river to the original channel depth of 21 feet, the defendants contend that, since there is a lack of evidence to fix the responsibility of each defendant for the amount of solids contributed by it to the deposits in the channel, it would not be proper to enter a mandatory order against all three defendants "jointly."

The Government has not in this case contended for joint liability and, accordingly, the court will not decree joint liability. Had the Government contended for joint liability, and had the case been tried on that basis, the court is inclined to think that it would have held the defendants jointly and severally liable for the commission of a public nuisance by obstructing a navigable stream. See Cook v. City of Du Quoin, 256 Ill.App. 452; Fox v. City of Joliet, 150 Ill.App. 491.

There is evidence that of the shoaling of the river between Stations 105 and 300, resulting from the deposit of industrial waste therein, the three defendants together are responsible for approximately 70% to approximately 93% thereof. There was evidence of the number of tons of iron and steel each defendant produces annually, the amount of water each of the defendants takes out of the Calumet River monthly, the number of sewers each defendant has emptying into the river, and that each of the defendants deposits industrial waste, including flue dust, into the river; but the exact amount of solids contributed by the defendants as a group to the deposits in the channel was not shown. As a matter of fact, the Government admits that there is insufficient data and information available to determine the three defendants' exact contribution to the industrial wastes in the Federal channel.

The court, upon consideration of all the evidence, has reached the conclusion that the mean of the aforesaid estimates, that is, 81.5% fairly represents the aggregate responsibility of the three defendants for the shoaling in the Federal channel between Stations 105 and 300, and that 81.5% of the waste material that has been deposited in the 21-foot Federal channel between Stations 105 and 300 should be removed by the three defendants, except to the extent that it has already been removed by them by dredging since 1951.

Some or all of the defendants have done dredging in the Federal channel between Stations 105 and 300 since 1951. The Government concedes that each of the three defendants should have credit for such dredging, if any, as it has done in the Federal channel since 1951. It seems to the court, and the court holds, that the total amount of deposits in the Federal channel between Stations 105 and 300 should be determined in the following manner.

Each defendant should show, by evidence satisfactory to the court, if it has not already done so, the amount of dredging it has done in the Federal channel since 1951. The aggregate of the dredgings, by such of the defendants as have dredged since 1951, should be added to the industrial wastes remaining in the channel between Stations 105 and 300, due consideration being given to the relative density of the wastes in the channel and that of the wastes in scows after dredging. The aggregate of the wastes in place in the channel and the wastes dredged as aforesaid since 1951 would give the wastes with which we are concerned in this case,—it being remembered that the three defendants are, in the aggregate, responsible only in respect of 81.5% of such aggregate wastes. And, since the three defendants are, in the aggregate, responsible in respect of only 81.5% of such aggregate wastes, when it comes to computing the

credits to which the three defendants are entitled for the dredging by them of wastes since 1951, it should be remembered that the wastes dredged by them were only 81.5% theirs and that the remaining 18.5% were wastes of other wrongdoers, and that, accordingly, when it comes to deducting for credit for dredging since 1951 only 81.5% of the amount of the dredging done by each defendant since 1951 should be allowed as a credit.

The three defendants are insistent that they be required to remove only what they themselves had deposited; accordingly, when it becomes necessary to compel them to do what they should have done voluntarily, there is no reason why they should be credited for the voluntary removal of wastes deposited by other wrongdoers.

The Government further admits that there is insufficient data and information available to determine each defendant's exact contribution of industrial wastes to the Federal channel, but suggest that the contribution of each defendant may be computed from the data and evidence in the record pertaining to the defendants' discharge of suspended solids; and the court has concluded, after considering all the evidence submitted by the parties, that the Government's suggestion is the nearest approach to accuracy that can be made under the circumstances, and, accordingly, finds and holds that the relative deposits of the three defendants were as follows:

| | |
|---|---|
| Republic Steel Corporation, | 36.78%' |
| International Harvester Company, | 36.31%' |
| Interlake Iron Corporation, | 26.91%'. |

The amounts of dredging, then, to be done by each defendant should be determined as follows:

In the case of the Republic Steel Corporation,
[36.78% of { 81.5% of (the aggregate of the wastes in the channel and the total of the dredgings of the three defendants since 1951) } ], less 81.5% of such, if any, dredging it may have done in the channel since 1951;

In the case of International Harvester Company,
[36.31% of { 81.5% of (the aggregate of the wastes in the channel and the total of the dredgings of the three defendants since 1951) } ], less 81.5% of such, if any, dredging as it may have done in the channel since 1951; and

In the case of Interlake Iron Corporation,
[26.91% of { 81.5% of (the aggregate of the wastes in the channel and the total of the dredgings of the three defendants since 1951) } ], less 81.5% of such, if any, dredging as it may have done in the channel since 1951.

It therefore appears to the court that the Government is entitled to an order directing the defendants severally, forthwith, to commence and, within six months, to complete the dredging in the preceding paragraphs specified.

With respect to the contention of International Harvester that, since it says it is willing to remove all material from the river for which it is responsible, if any, when the amount of such material has been properly determined, the injunctional relief sought should not be granted against it,—the court is quite familiar with those cases which hold that injunctions should not be issued where it is not necessary to do so, but, in the court's opinion, this is not such a case even with respect to International Harvester. It is true that its contentions have not been so extreme as those of the other defendants, but it, in effect, contends that while it admits it has committed a public nuisance by placing obstructions in a public stream it should not be commanded by a court to put an end to that nuisance because it is willing to remove what, after long and difficult litigation, the plaintiff may be able

to prove that it should remove. International Harvester, like the other two defendants, has required the Government to come into court and point out just exactly what it should remove from a public stream though it knows, or ought to know, better than anyone else just exactly what it put in the stream. Since the Government was required to come into court and spend long weeks in litigation, it seems to the court that it is entitled to complete relief, including a mandatory injunction against even the International Harvester Company.

■■ Republic's contention that the Government's claim is barred by the Illinois five-year statute of limitations is not well taken, since state statutes of limitations are inapplicable to the United States when asserting governmental rights. Chesapeake & Delaware Canal Co. v. U. S., 250 U.S. 123, 39 S.Ct. 407, 63 L.Ed. 889.

There are filed herewith findings of fact and conclusions of law.

Counsel for the Government may prepare and within five days and, on notice, present, a draft of a decree not inconsistent with this memorandum and the findings of fact and conclusions of law filed herewith.

### Findings of Fact

The court on the trial of the above-entitled cause having considered the pleadings filed herein, having heard and weighed the evidence offered by the parties hereto, and having heard and considered the arguments of counsel, makes the following Findings of Fact in said cause:

1. The United States of America brought an action in equity to secure an injunction restraining and enjoining the defendants from depositing or discharging industrial solids and flue dust into the channel of the Calumet River without first obtaining a permit from the Department of the Army providing for satisfactory conditions for the removal of such deposits and discharges, and a mandatory injunction commanding and directing the defendants, by dredging operations or otherwise, to restore the Federal channel of the Calumet River, between Stations 105 and 300, to the original channel depth of 21 feet.

2. The Calumet River at Lake Michigan is located approximately 11½ miles south of the Chicago Harbor, which is directly east of the loop in the City of Chicago and State of Illinois. The Calumet River is a busy waterway and is used by a large number of lake and foreign ships. Many of these ships are 600 or more feet in length with a 60-foot beam and a loaded draft of 21 feet and propeller diameter of 15 feet.

3. The Calumet River extends from Lake Michigan to the junction of the Little Calumet and the Grand Calumet Rivers. The Calumet River originally emptied into Lake Michigan.

4. The flow of the Calumet River and a portion of the Little Calumet River was reversed in order to divert the polluted waters of these two rivers, as well as those of the Grand Calumet River, away from Lake Michigan. This was accomplished in 1922 when the Chicago Sanitary District completed the construction of the Calumet-Sag Channel. This channel extends westerly from a point on the Little Calumet River near Blue Island, Illinois, to the Chicago Sanitary and Ship Canal, a distance of approximately 16 miles, and carries polluted waters away from Lake Michigan through the Chicago Sanitary and Ship Canal and Illinois Waterway into the Mississippi River.

5. With the exception of short periods of excessively heavy rainfall, the normal direction of flow of the Calumet River since 1922 is away from Lake Michigan.

6. The level of Lake Michigan will vary the flow in the Calumet River and temporarily increase the velocity when the lake is rising.

7. The Calumet River is actually more of a canal than a river, inasmuch as normally the current has a very low velocity.

8. The Corps of Engineers of the Department of the Army has been designated by Acts of Congress to maintain a Federal channel in the Calumet River for the purpose of navigation. That channel has been continuously maintained since the year 1881. The channel of the Calumet River is marked at 100-foot intervals called "stations." Station O is near the Elgin, Joliet and Eastern Railroad bridge and Station 300 is just north of 130th Street.

9. The channel of the Calumet River from Station O to Station 300 has a minimum width of 200 feet. Under Acts of Congress, the Corps of Engineers of the Department of the Army are designated to maintain a minimum depth of 21 feet in the Federal channel. The 21-foot depth is based upon low water datum. Low water datum has been established at elevation 578.5 feet above mean tide at New York as a plane of reference for all charts and soundings of Lake Michigan and connecting waters.

10. The Wisconsin Steel Division of International Harvester Company is located on the west bank of the Calumet River with a river frontage extending from about 108th Street to 111th Street. Interlake Iron Corporation is located on the east bank of the river from about 107th Street to 111th Street and on the west bank of the river from about 111th Street to 114th Street. Republic Steel Corporation is located along the east bank and extends from 111th Street to about 122nd Street, which is just south of turning basin No. 3.

11. All three of the defendants in this case are engaged in the production of iron and related products.

12. The defendants' mills have been in operation for many years.

13. The defendants use iron ore, limestone, and coke to produce iron. Coke is produced from coal by each defendant.

14. Republic Steel Corporation produces approximately 500,000 gross tons of iron and 1,300,000 gross tons of steel ingots per year; Wisconsin Steel Division of International Harvester Company produces approximately 650,000 gross tons of iron and 1,000,000 gross tons of steel ingots per year; and Interlake Iron Corporation produces approximately 450,000 gross tons of iron per year and no steel ingots.

15. As a result of the production of iron by all three defendants, certain industrial wastes are created, consisting of flue dust containing a high percentage of iron oxide, slag, calcined lime and other solids. In the production of coke and iron and steel products, additional wastes are created, such as coke, breeze, mill scale, and other solids from the many and varied plant operations.

16. In these operations and in the production of coke at these plants all defendants pump water in vast amounts out of the Calumet River and use it in their manufacturing processes for cooling, removal of solids from industrial gases and transporting industrial wastes. The amount of water taken out of the Calumet River and used by the defendants each month is approximately as follows:

| | |
|---|---|
| Republic Steel Corporation, | 2,500,000,000 gallons |
| Wisconsin Steel Division of International Harvester Company, | 2,655,000,000 gallons |
| Interlake Iron Corporation, | 1,031,120,000 gallons. |

17. After its use, the water is returned through the various sewers of the defendants, which empty directly into the Calumet River, and two slips, which open into the Calumet River.

18. Republic Steel Corporation has eight sewers, Interlake Iron Corporation has five sewers, and International Harvester Company has fourteen sewers emptying into the river directly or by way of said slips.

19. Each of the defendants maintains and operates a single thickener, which is a tank-type settling basin de-

signed to recover a substantial amount of the fine flue dust solids from the water used in washing blast furnace gases. The overflow therefrom, including the solids not removed by the thickeners, discharges in each case into a sewer emptying into the Calumet River. The flow in the remaining sewers of each defendant, including the solids transported therein, discharge into the Calumet River without passing through a thickener.

20. Prior to 1951 the three defendants periodically dredged industrial solids from the river adjacent to their plants, in compliance with requests by the Corps of Engineers. In 1951 the three defendants prorated the cost of dredging the channel between Stations 146 and 200 on the basis of the proportionate number of tons of pig iron produced by each defendant. The three defendants have not participated in a joint restoration of channel dimensions since 1951.

21. In 1951 the channel was restored to a minimum depth of 21 feet. This was verified by soundings taken by the Corps of Engineers of the Department of the Army. Since 1951 the Wisconsin Steel Division of International Harvester Company and Interlake Iron Corporation have removed relatively small quantities of material from the Federal channel in connection with the removal of deposits from slips and along their river docks.

22. The Corps of Engineers maintains a field office on the Calumet River bank near 91st Street. A crew of men working out of that office periodically take soundings to determine the depth of the Federal channel in the Calumet River so that steps may be taken to keep it open for navigation.

23. Because of the nature of the industrial solids being deposited in the Calumet River, the Corps of Engineers of the Department of the Army uses a special sounding weight weighing 10 pounds and having a round steel disk affixed to the bottom of it 6 inches in diameter. In taking soundings this weight is lowered into the water until the man taking the sounding feels resistance on the steel plate of the sounding weight. The depth of the water is then measured. This type of sounding weight and method of sounding has been used in this area for a number of years. Quantities computed from such soundings in the past, and increased by 5% for bulking, compare closely with the quantities dredged and measured in calibrated scows.

24. All soundings are recorded in note books, and, after being reduced to low water datum, are entered on charts of the river and channel. Prior to taking the soundings, the location is accurately determined with reference to the channel lines and stations.

25. Since 1951 the soundings have shown there was a progressive decrease in the depth of the channel in the vicinity of the mills of the three defendants and downstream therefrom.

26. The Corps of Engineers thereupon made demand upon the defendants to dredge the channel in the vicinity of their mills as they had done in 1951. All defendants refused.

27. Thereafter studies were made to determine the extent of the responsiblity of the three defendants. Samples were taken from the sewers of all defendants. These samples were all recorded in government sample record books and were sent to various laboratories for physical, chemical, and petrographic analyses.

28. Chemical analyses of composite samples taken from the various defendants' sewers showed high percentages of iron oxide, a component positively identifiable with the defendants' operations. Petrographic analyses of composite samples taken from the defendants' sewers showed that the solids consisted largely of metallic iron, slag, calcined (burned) limestone, graphite, and other iron and steel mill wastes, which are positively identifiable with the defendants' operations.

29. Samples were taken from the river bottom in the vicinity of the mills

of the defendants. These were likewise analyzed chemically and petrographically and showed substantially the same components as those found in the sewer outfalls. One of the most significant findings in all of these reports is the high percentage of material positively assignable to iron and steel mill origin.

30. Although sewer outfalls are emptying many fine particles of less than 325 mesh, nevertheless those fine particles tend to flocculate into larger units, that is, they are attracted and held together by electrical forces and tend to deposit loosely on the river bottom in a form that could be represented on a larger scale by a pile of matchsticks dropped at random. Larger and heavier particles tend to fall into the settled flocculated material without increasing the volume. A study of the solids found in various shoals in the vicinity of the mills showed a high accumulation of iron oxide. This is primarily due to industrial waste coming from the three defendants' mills.

31. In order to estimate the amount of solids of steel mill origin in the river, it is not practicable to make dependable calculations based upon the percentage of suspended solids found in the samples of the sewer effluents, because any sample is actually only representative of what is in the sewer effluent at the time the particular sample is taken.

32. The constituents in the samples from the defendants' sewers vary greatly from time to time. This was shown not only in the samples taken by the Corps of Engineers but also in those taken on behalf of the defendants.

33. The expense of round-the-clock sampling of all sewer outfalls for an extended period and an analysis of each and every sample individually would amount to such a great sum as to make that procedure impractical. Samples taken by both the Corps of Engineers and the defendants showed that solids are being deposited into the river from all sewers of the defendants. These solids are in excess of those being transported in the water at the time it is being pumped out of the river by the defendants. The solids being deposited in the Calumet River from the sewers of the defendants are being transported by suspension in the water and are not in solution or in a liquid state.

34. Considerable evidence was introduced with reference to the possibility of there being other sources of shoaling in the Calumet River in the vicinity of the mills of the three defendants. Two other iron mills are located along the banks of the entrance channel of the Calumet River lakeward of Station O. These are the United States Steel Company and Youngstown Sheet and Tube Company. Since 1951 these two companies have paid for the dredging annually of all shoals in the entrance channel in order to maintain the authorized channel depth of 26 feet at that point. Those shoals were composed of steel mill wastes but the evidence shows that the solids composing those shoals did not travel downstream as far as the plants of the three defendants. Bank erosion contributes so little to the shoals that it may be disregarded inasmuch as there are only small areas of natural bank in the vicinity of the mills of the three defendants. Most of the bank adjacent to the properties of the defendants is protected by docks, bulkheads, or other substantial material. Surface erosion from the land adjacent to the river is of such a small quantity that it may practically be disregarded as a contributing factor in the build-up of the shoals. Other industries located along the banks of the river discharge either very small quantities or no solids into the river.

35. City sewers do not empty into the river except to carry storm water overflow.

36. The dust fall in this area resulting from air pollution contributes a very small amount.

37. Various methods may be used to estimate the percentage of responsibility of the three defendants for the shoaling in the river adjacent to their properties

and such methods show the responsibility of approximately 70% to 93%. No method of calculation based upon the available data can show an exact result.

38. The preponderance of the evidence shows that all three defendants, through their various sewer outfalls, are emptying industrial solids into the Calumet River, and the Government is entitled to an injunction against all of the defendants restraining such practice in the future.

39. The preponderance of the evidence further shows that the action of the defendants in dumping industrial solids into the Calumet River in the vicinity of their mills since 1951 has resulted in considerable shoaling in the Federal channel reducing the depth of the channel in some places to 17 feet and in some instances to 12 feet, along the sides of the channel, thus reducing the navigable capacity of the channel and providing a serious hazard to ships using the channel.

40. The Government is entitled to an injunction restraining and enjoining the defendants from depositing or discharging industrial solids and flue dust into the channel of the Calumet River without first obtaining a permit from the Department of the Army providing for satisfactory conditions for the removal of such deposits.

41. Defendants are entitled to a reasonable length of time, not exceeding six months, to cease the discharge of industrial solids into the Calumet River.

42. The Government is entitled to a mandatory injunction, commanding and directing the defendants, by dredging, to remove from the Federal channel of the Calumet River between Stations 105 and 300, within a reasonable time, not exceeding six months, such industrial wastes, including flue dust, as they, respectively, may have deposited in such channel.

43. Of the industrial wastes, including flue dust, in the 21-foot Federal channel of the Calumet River between Sta-

tions 105 and 300, not less than 81.5% thereof was deposited therein by the three defendants.

44. Of the industrial wastes, including flue dust, in the 21-foot Federal channel of the Calumet River between Stations 105 and 300, deposited by the three defendants, Republic Steel Corporation, International Harvester Company, and Interlake Iron Corporation,— Republic Steel Corporation deposited 36.78% thereof, International Harvester Company deposited 36.31% thereof, and Interlake Iron Corporation deposited 26.91% thereof.

45. Each of the three defendants should, within six months from the date hereof, remove from the 21-foot channel of the Calumet River between Stations 105 and 300 such industrial wastes, including flue dust, as it has deposited therein, except to the extent that it has already removed such industrial wastes, including flue dusts, since 1951, due consideration being given to the difference in density of industrial wastes, including flue dust, in the channel and in scows after dredging.

46. That each of the three defendants should show, by evidence satisfactory to the court, if it has not already done so, the amount of dredging it has done in the 21-foot Federal channel of the Calumet River between Stations 105 and 300 since 1951.

47. That of the industrial wastes, including flue dust, removed from the 21-foot Federal channel of the Calumet River between Stations 105 and 300 by each of the defendants since 1951 only 81.5% thereof was wastes chargeable to such defendants and 18.5% thereof was chargeable to a person or persons unknown or to natural causes.

48. That the amounts of dredging to be done by each of the three defendants should be determined as follows:

In the case of the Republic Steel Corporation,

[36.78% of { 81.5% of (the aggregate of the wastes in the channel and the

total of the dredgings of the three defendants since 1951) } ] less 81.5% of such, if any, dredging it may have done in the channel since 1951;

In the case of International Harvester Company,

[36.31% of { 81.5% of (the aggregate of the wastes in the channel and the total of the dredgings of the three defendants since 1951) } ] less 81.5% of such, if any, dredging as it may have done in the channel since 1951; and

In the case of Interlake Iron Corporation,

[26.91% of { 81.5% of (the aggregate of the wastes in the channel and the total of the dredgings of the three defendants since 1951) } ] less 81.5% of such, if any, dredging as it may have done in the channel since 1951.

### Conclusions of Law

1. The court has jurisdiction of this case.

2. This action was properly brought because the defendants are discharging industrial solids into the Calumet River, in violation of the Federal statutes, 33 U.S.C.A. §§ 403, 407, and this constitutes an interference with navigation and commerce.

3. The solids discharged into the Calumet River through the various sewers of the three defendants are not in a "liquid state."

4. The Government, having brought this action under a Federal statute, properly joined all the three defendants in this suit although they are operating separate mills.

5. The United States cannot be restricted by state practice or procedure in the enforcement of Federal rights.

6. The Illinois statute of limitations is not binding upon the United States of America and the motion of the Government to strike the defense pleaded by the Republic Steel Corporation should be sustained.

7. The United States of America is entitled to the relief prayed in the amended complaint, including an injunction restraining each of the defendants from depositing or discharging and from permitting to be deposited or discharged from its mills, into the Federal channel of the Calumet River between Stations 105 and 300, industrial solids, including flue dust, without first obtaining a permit from the Department of the Army providing for satisfactory conditions for the removal of such deposits, said injunction to become effective and binding on the defendants from and after six months from this date.

8. The United States of America is entitled to a mandatory injunction, commanding and directing the Republic Steel Corporation to remove, by dredging, from the Federal channel of the Calumet River between Stations 105 and 300, within a reasonable time, not exceeding six months, the industrial solids or wastes, including flue dust, deposited by it in said channel; the amount of the dredging to be done by said defendant shall be determined in the following manner:

[36.78% of { 81.5% of (the aggregate of the industrial solids or wastes in the channel and the total of the dredgings of the three defendants since 1951) }] less 81.5% of such, if any, dredging it may have done in the channel since 1951.

9. The United States of America is entitled to a mandatory injunction, commanding and directing the International Harvester Company to remove, by dredging from the Federal channel of the Calumet River between Stations 105 and 300, within a reasonable time, not exceeding six months, the industrial solids or wastes including flue dust, deposited by it in said channel; the amount of the dredging to be done by said defendant shall be determined in the following manner:

[36.31% of { 81.5% of (the aggregate of the industrial solids or wastes in the channel and the total of the dredgings of the three defendants since 1951). } ] less 81.5% of such, if any, dredging it may have done in the channel since 1951.

10. The United States of America is entitled to a mandatory injunction, commanding and directing the Interlake Iron Corp. to remove, by dredging, from the Federal channel of the Calumet River between Stations 105 and 300, within a reasonable time, not exceeding six months, the industrial solids or wastes, including flue dust, deposited by it in said channel; the amount of the dredging to be done by said defendant shall be determined in the following manner:

[26.91% of { 81.5% of (the aggregate of the industrial solids or wastes in the channel and the total of the dredgings of the three defendants since 1951) } ] less 81.5% of such, if any dredging it may have done in the channel since 1951.

### Decree

This cause having come on for trial before the court on the amended complaint of the United States of America and the several answers of the defendants, Republic Steel Corporation, International Harvester Company, and Interlake Iron Corporation, upon the conclusion of which the court heard oral argument by counsel on behalf of all parties, read the briefs of all parties, and having given due consideration thereto, the court thereupon issued its memorandum opinion, made its findings of fact specially and stated its conclusions of law separately, and having directed entry of judgment in favor of the plaintiff United States of America, therefore,

It is hereby adjudged, decreed, and ordered:

1. That the defendants, Republic Steel Corporation, International Harvester Company, and Interlake Iron Corporation, and each of them, their assigns and successors, whether by merger or otherwise, their officers, agents, servants, employees and attorneys, and persons in active concert or participation with them who receive actual notice of this Decree by personal service or otherwise, be and hereby they are Enjoined and Restrained from depositing or discharging and from permitting or causing directly or in-directly to be deposited or discharged into the federal channel of the Calumet River, a navigable stream of the United States, within the territorial jurisdiction of this court, between Stations 105 and 300, industrial solids, including flue dust without first obtaining a permit from the Chief of Engineers of the Department of the Army of the United States of America, providing for satisfactory conditions for the removal of such future deposits and discharges, said injunction to become effective and binding on the defendants, Republic Steel Corporation, International Harvester Company, and Interlake Iron Corporation, and each of them, their officers, agents, servants, employees, assigns, successors, whether by merger or otherwise, and all persons in active concert or participation with them who receive actual notice of this Decree by personal service or otherwise from and after six months of the date of the entry of this Decree.

2. The defendant, Republic Steel Corporation, its successors or assigns by consolidation, merger or otherwise, is hereby enjoined and ordered to restore to a depth of 21 feet below low water datum for Lake Michigan the federal channel of the Calumet River, a navigable stream of the United States of America, within the territorial jurisdiction of this court, between Stations 105 and 300, by dredging within a reasonable time not exceeding one year the industrial solids or wastes, including flue dust, deposited by said Republic Steel Corporation in said federal channel of the said Calumet River; the amount of the dredging to be done by said defendant, Republic Steel Corporation, shall be determined in the following manner:

36.78% of 81.5% of the aggregate of the industrial solids or wastes, including flue dust, found in the federal channel of the Calumet River aforesaid, and the total of the dredgings of each of the three defendants herein since 1951 in said federal channel, less the total of any dredging the said Republic Steel

Corporation may have done in the said federal channel since 1951.

3. The defendant, International Harvester Company, its successors or assigns by consolidation, merger or otherwise, is hereby enjoined and ordered to restore to a depth of 21 feet below low water datum for Lake Michigan the federal channel of the Calumet River, a navigable stream of the United States of America, within the territorial jurisdiction of this court, between Stations 105 and 300, by dredging within a reasonable time not exceeding one year the industrial solids or wastes, including flue dust, deposited by said International Harvester Company in said federal channel of the said Calumet River; the amount of the dredging to be done by said defendant, International Harvester Company, shall be determined in the following manner: 36.31% of 81.5% of the aggregate of the industrial solids or wastes, including flue dust, found in the federal channel of the Calumet River aforesaid, and the total of the dredgings of each of the three defendants herein since 1951 in said federal channel, less the total of any dredging the said International Harvester Company may have done in the said federal channel since 1951.

4. The defendant, Interlake Iron Corporation, its successors or assigns by consolidation, merger or otherwise, is hereby enjoined and ordered to restore to a depth of 21 feet below low water datum for Lake Michigan the federal channel of the Calumet River, a navigable stream of the United States of America, within the territorial jurisdiction of this court, between Stations 105 and 300, by dredging within a reasonable time not exceeding one year the industrial solids or wastes, including flue dust, deposited by said Interlake Iron Corporation in said federal channel of the said Calumet River; the amount of the dredging to be done by said defendant, Interlake Iron Corporation, shall be determined in the following manner: 26.91% of 81.5% of the aggregate of the industrial solids or wastes, including flue dust, found in the federal channel of

the Calumet River aforesaid, and the total of the dredgings of each of the three defendants herein since 1951 in said federal channel, less the total of any dredging the said Interlake Iron Corporation may have done in the said federal channel since 1951.

5. Plaintiff, United States of America, shall have judgment for costs against all of the defendants.