**UNITED STATES of America,**
**Plaintiff,**

**v.**

**ARMCO STEEL CORPORATION, Defendant and Third Party Plaintiffs,**

**v.**

**William RUCKELSHAUS, Individually and as Administrator of the United States Environmental Protection Agency, et al., Third Party Defendants.**

**Civ. A. No. 70–H–1335.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 17, 1971.

Anthony J. P. Farris, U. S. Atty., Rex R. Green, Asst. U. S. Atty., Houston, Tex., and Shiro Kashiwa, U. S. Asst. Atty. Gen., John P. Hills, Atty., Dept. of Justice, Washington, D. C., for plaintiffs and third-party defendants William Ruckelshaus and John Mitchell.

Butler, Binion, Rice, Cook & Knapp, Fletcher Etheridge and George W. Rice, Houston, Tex., for defendant and third-party plaintiff.

Crawford C. Martin, Atty. Gen., of Tex., Roland H. Allen and Richard W. Chote, Asst. Attys. Gen., Austin, Tex., for third-party defendants Gordon Fulcher and others.

MEMORANDUM AND OPINION:

HANNAY, District Judge.

This suit was instituted by the United States against the Armco Steel Corporation to permanently enjoin it from discharging certain effluent wastes into the Houston Ship Channel, Harris County, Texas. With subject matter jurisdiction predicated on Title 28, U.S.C.A., Section 1345 in the original complaint, the United States charges Armco with violation of Title 33, United States Code Annotated, Section 407, Section 13 of the Rivers and Harbors Act of 1899, and urges its claimed remedy here under the authority of Title 33, United States Code Annotated, Section 413.

33 U.S.C.A. § 407 provides, inter alia:

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or

deposited * * * from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water * * * *provided further,* that the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material * * *."

It is not disputed that the mentioned permit from the Chief of Engineers was not at any material time possessed by Armco. The original complaint alleges that the effluent wastes discharged into the Channel consisted among other elements of cyanide, phenols, sulfides, ammonia, and other volatile residue. Of the some sixteen Armco outfalls into the Channel, proof at the trial was made as to only four of these in respect to discharge of the alleged refuse. More detailed treatment of this proof and the legal effect thereof will be made later herein. It will suffice at this point to state that there was ample proof of discharge of the mentioned effluents upon a significant and substantial scale with results, actual and potential, deleterious and even deadly to the existence and survival of organic and marine life in the Channel.

The record is clear that Armco was aware of and concerned itself with its part in the general, serious, and growing Channel pollution as of 1968. Studies and efforts were initiated by it to determine and give effect to a feasible, effective, and—no doubt—corporately affordable as well as governmentally acceptable method of disposing of the highly toxic wastes. Pursuant to this remedial program by the corporation, and subsequent to the filing of the original complaint herein by the United States, Armco was authorized and ordered by the Texas Water Quality Board, through its chairman Gordon Fulcher and the six other members of that Board, to commence drilling an injection well disposal system by April 25, 1971. Under this state order, the injection well system was to be completed by the end of October, 1971. Failing commencement of the project on the date ordered, Armco would have suffered revocation of its industrial waste discharge permit by the Texas Water Quality Board. The purpose of the state order was to provide through the injection well system a safe and feasible depository for the deleterious waste products in question. Armco duly commenced this operation. The action of the Texas Water Quality Board was authorized by Article 7621b, Vernon's Annotated Civil Statutes, the state Injection Well Act. In the wake of this state authorization, the United States filed its amended or supplemental complaint to additionally enjoin Armco from completing the injection well disposal system and to enjoin the Texas Water Quality Board, hereafter Fulcher et al., from enforcing its mentioned order concerning the injection well system. Caught between the conflicting demands of two separate sovereigns, Armco brought on its counterclaim and third party complaint. The Court thereupon ordered that the *status quo* on the injection well project be maintained pending the outcome of this suit.

The amended or supplemental complaint of the United States discloses on its face that it is the stated policy of the Federal Environmental Protection Agency to oppose subsurface disposal of waste in general because of the potential and presently unpredictable long-term dangers that may inhere in the practice. The record in this case discloses that the practical danger, if any, lies to the subsurface fresh water sands in the area which bottom at approximately 2,600 feet

beneath the surface. The proposed injection wells will penetrate to and effect their deposit in the lower portion of the Frio Sands which in the area is located some 6,300 feet to 7,000 feet beneath the surface. In addition to a number of shale sections at shallower depths below the fresh water sands, there is found between the approximate depths of 4,700 feet and 5,200 feet the Anahuac Shale section which in the area around Armco's Houston Works is approximately 400 to 500 feet thick; and between the Anahuac Shale and the proposed injection zone there are found additional shale sections varying in thickness from 20 to 50 to 100 feet and having a total thickness of 500 feet. The Anahuac Shale extends from under the Gulf of Mexico to about 25 or 30 miles north of Houston and from the vicinity of Corpus Christi, Texas to Mississippi. The logs and the testimony reveal that the other shale sections between the Anahuac Shale and the proposed injection zone also have a substantial lateral extent. The expert testimony is overwhelming that such shales are impermeable and constitute aquicludes or barriers to the vertical migration of fluid. Particular attention is drawn to the Anahuac Shale. The credible expert testimony is to the effect that it is and of itself veritably impenetrable to the upward migration of fluids. Faults that may have occurred in the shales are not calculated to permit the upward migration of fluids because of the texture of the shales which render the faults of limited size and a self sealing quality. The foregoing conclusions, based upon the weight of persuasive expert testimony, do not overlook the fact that Armco's expert witness Campbell cannot be said to be totally disinterested as an officer of Subsurface Disposal Corporation. But the point is repeatedly made, with impressive expertise, that if the shales were permeable subsurface fresh water supplies would have vanished eons ago. The Anahuac Shale, like the Frio Sands, extends a great distance from the point of proposed injection and critically over-lays the Frio Sands in point of distance and thickness as concerns this case. The cognizable danger here, if any, arises from a past history of exploration for oil and gas in the area. Considerable expert testimony has been brought forth on this subject as it is material here. In any case, the Plaintiff asks this Court, assuming its equity jurisdiction in this controversy over the navigable waterway which is the Houston Ship Channel, to extend that jurisdiction in its equity and discretionary powers to a distinct and separate area wherein the state legislature has already spoken and the national legislature is free to do so but has not. This federal equity Court is asked to additionally prevent by injunction the proposed subsurface disposal and to direct a method by which the waste disposals can be acceptably accomplished.

I.

Armco vigorously contests the equity jurisdiction of the trial Court to enjoin the discharges into the channel under Section 13 of the Rivers and and Harbors Act. It is argued that an adequate remedy at law would lie in a criminal prosecution to determine the violation, if any, of Section 13. It is argued that the proof demonstrates that the waste effluents—cyanides, phenols, sulfides, and ammonia—are discharged in solution rather than as solids and therefore constitute no physical obstruction to navigation within such alleged limited intendment and purview of the statute. It is urged that the effluents emanate from "sewers" and are liquid "sewage" and are therefore within the exception to the statute. But the full reading and fair interpretation of the United States Supreme Court authorities of United States v. Republic Steel Corporation, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed. 2d 903 (remanded, 286 F.2d 875, 7 Cir., affirming in part and reversing in part 155 F.Supp. 442, Dist.Ct.N.D.Ill.) and United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492, clearly negative the foregoing contention of Armco. These authorities direct a

broad rather than a narrow, cramped, and grudging reading of the statute. It is to be read in light of its whole legislative history; it includes " * * * all foreign substances and pollutants * * " that are not within the exception; the liquid nature of the effluent will not bring it within the exception if it is otherwise an obstruction to navigation *or* a pollutant. United States v. Standard Oil Co., supra; United States v. United States Steel Corp., D.C.Ind., 328 F.Supp. 354. Apart from the massively poisonous quality of the effluents here, they are admittedly volatile. Armco's contention that this suit is improvidently brought under the Rivers and Harbors, or Refuse, Act, 33 U.S.C.A. 407, and should instead have been brought under the Federal Water Pollution Act, Title 33, U.S.C.A., Section 1160, is, in the judgment of this Court, effectively refuted by the well considered decision in United States v. Interlake Steel Corp., N.D.Ill.1969, 297 F.Supp. 912.

" * * * This Court does rule that the Water Quality Act of 1965 cannot be held to supercede or emasculate the prohibitions of the Rivers and Harbors Act. The legislative purpose of the Water Quality Act was to initiate programs designed to elicit state, municipal and industrial co-operation in the elimination or reduction of water pollution, which imperils our 'single greatest resource.' 1965 U.S.Code Cong. & Adm.News pp. 3313–3328. The defendant's interpretation of this statute, which this court cannot accept, would relax the prohibitions against discharging refuse into the nation's waters as proscribed by the Rivers and Harbors Act, by invoking legislation clearly intended to secure *higher* water quality standards. The statute itself negates such an interpretation. Standards set by a state agency must be consistent with any applicable water quality standards established pursuant to current law within a given river, lake, etc. 33 U.S.C.A. § 466a(c) (2) (A). Discharge matter prohibited by the Rivers and Harbors Act cannot be condoned under the standards set by a state agency pursuant to the Water Quality Act * * *. Nowhere in the Water Quality Act and its legislative history can this court find any congressional intent to repeal or modify the Rivers and Harbors Act. To the contrary, the Water Pollution Control Act of 1956, to which the Water Quality Act of 1965 is an amendment, states that 33 U.S.C. §§ 466–466k shall not be construed as 'affecting or impairing the provisions of * * * (section) 407 * * * of this title,' i. e., Section 13 of the Rivers and Harbors Act. 33 U.S.C. § 466k. * * * " 297 F.Supp., at 916.

1. Of Armco's sixteen outfalls into the Houston Ship Channel Plaintiff's proof is directed to and limited to those outfalls designated 5/6, 9/1, 9/2 and 11. Outfalls 9/2 and 11 discharge the effluents which are respectively the liquids used to clean blast furnace gas and those that result from the cleaning of coke oven gas in the coke oven by-products plant. This blast furnace (serviced by outfall No. 9/2) and the coke plant (serviced by outfall No. 11) are part of what is called the "Blast Furnace Area" of Armco's Houston plant. The operations in the Blast Furnace Area are dependent upon the continued operation of the coke plant absent a hitherto unavailable quantity of proper grade coke. Nonetheless, the discharges through outfalls No. 9/2 and 11 are demonstrated to contain a high degree of toxic cyanide, phenols, ammonia, and sulfides. The volume of water discharged into the Channel from outfall No. 9/2 is 720,000 gallons per day, and this water contains 2.25 milligrams per liter of cyanide and 139 milligrams per liter of phenols. The weight of the cyanide discharged is approximately 13.5 pounds per day and the weight of the phenols discharged is approximately 0.83 pounds per day. The volume of water discharged into the Channel from outfall No. 11 is 2,600,000 gallons per day. This water contains 45.0 milligrams per liter of cyanide, 17.7 milligrams per

liter of phenols, 251 milligrams per liter of ammonia and 185 milligrams per liter of sulfides. The weight of these chemicals discharged per day from outfall No. 11 is approximately 975.78 pounds per day of cyanide, 383.8 pounds per day of phenols, and from 6,201 to 11,996 pounds per day of ammonia. The nature of the discharges from outfalls No. 9/2 and 11 has been substantially the same for approximately twenty (20) years. However, the amount of ammonia discharged into the Channel from the coke plant was greatly increased as the result of the abandonment of the ammonium sulfate production unit in the late 1950's.

Armco objects to the substantiality of the proof as to the effluents from outfalls No. 5/6 and 9/1. But the proof does show that cyanide is discharged from outfall No. 5/6 in the amount of 4.40 pounds per day with a concentration of .11 milligrams per liter. From outfall No. 5/6 there is .1 pounds of phenols daily. From outfall No. 9/1 there is 21.10 pounds of cyanide per day with a concentration of .11 milligrams per liter. Phenols were found to be discharged from outfall No. 9/1 in the amount of 2.1 pounds per day.

It is undisputed in the proof that cyanide is one of the most toxic elements known. Credible expert testimony, based upon tests actually made, revealed that the effluents from outfall No. 11 containing from 10 to 20 parts per million of cyanide was lethal within a few minutes to shrimp and small fish of the species found in the Galveston Bay area. To the same specie of fish, 1 part per million of cyanide was lethal within four days with the majority thereof dying within 30 minutes. While the conclusiveness of this expert testimony is vigorously contested by Armco, it nonetheless further showed that assuming 1000 pounds of cyanide discharged each day from a point near Armco's outfall 11, cyanide concentrations of predictably .20 parts per million could be found for four miles adjacent to the outfall on the Channel 30% of the time. Again, assuming 1000 pounds of cyanide dis-

charged per day from the outfall No. 11 vicinity, concentrations of cyanide in the amount of .13 milligrams per liter would be found in the Channel 70% of the time. There can be little doubt that in time of rainfall there is a downstream movement of Armco effluents toward Galveston Bay and the open Gulf. There is testimony that an actual fish kill in the hundreds was observed at a down-channel point where Armco's effluents from outfall No. 11 were most concentrated.

Credible expert testimony persuasively reveals that cyanide is lethal to some species of fish in concentrations as low as .05 parts per million or .05 milligrams per liter. Concentrations of .28 parts per million, or .28 milligrams per liter, could cause death to a number of species of fish.

The coke plant of Armco from which the effluents discharged through outfall No. 11 originate is patently antiquated from the standpoint of pollution control. Its deficiency in this respect lies in the absence of a recirculating cooling system, a dephenolizer, and an ammonia absorber. The existence of a high ammonia content in the coke plant is the apparent reason the waste is difficult to treat. It is apparent that, in probability and barring the unexpected, the coke plant capacity at Armco per month will be increased substantially in the future. This means, absent correction at the source, that the immediately resulting adverse situation in the Channel can only be commensurately aggravated.

▮ From the foregoing proof of record I find and hold that there is violation by Armco of Section 13 of the Rivers and Harbors, or Refuse Act, of 1899 that is remediable by injunction.

## II.

▮ Plaintiff urges this Court's ancillary jurisdiction over the injection well system on two theories. One is the equity principle that a Court of equity will render complete rather than partial relief, that it will adjudicate by the whole

rather than by halves. Cited on this theory by Plaintiff are Alexander v. Hillman, 296 U.S. 222, 242, 56 S.Ct. 204, 80 L.Ed. 192; Camp v. Boyd, 229 U.S. 530, 551, 552, 33 S.Ct. 785, 57 L.Ed. 1317; 27 Am.Jur. 2nd Equity Section 108 et seq; 44 Am.Jur. 2nd Federal Practice and Procedure Section 45. This, however, is not an ordinary equity suit wherein a question of law might arise the resolution of which is essential to a conclusion of the suit. This is not the ordinary situation wherein an equity court might exercise ancillary powers to avoid the waste and cost incident to a multiplicity of suits. In general and in the particular, the environmental pollution peril to which this suit is addressed is hardly to be eliminated by one tribunal of the central government or of either sovereignty—state or federal—acting alone. In general and in the particular, and especially by a court of conscience, it is not a difficulty that can be viewed as existing entirely in a vacuum. Federal courts are courts of specified and limited jurisdiction—however supreme they may be within the sphere of their legitimate powers. Federal jurisdictional statutes are to be strictly, not expansively, construed. The statutory basis for this suit arises strictly from constitutional federal authority over the nation's navigable rivers and waterways. The phenomenon of subsurface disposal for industrial wastes might well give rise to Congressional legislative control under the federal commerce power or other designated federal Constitutional powers. In the present posture of legislation on the subject, both as to territorial and subject matter jurisdiction, it is now primarily the responsibility of the several states.

■ But the Plaintiff also urges the theory of pendent jurisdiction. This is the theory by which a federal court in a substantial federal controversy might also under certain circumstances take cognizance of a similar, parallel or related state claim. United Mine Workers of America v. Gibbs, 383 U.S. 715, 721–729, 86 S.Ct. 1130, 16 L.Ed.2d 218.

"Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under the Constitution, the Laws of the United States, and Treaties made, or which shall be made under their Authority * * *,' U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case' * * *.'" 383 U.S., at 725, 86 S.Ct., at 1138.

■ Application of the doctrine of pendent jurisdiction, however, is a matter of judicial discretion rather than of a litigant's right. It has always been concerned with the graver questions of jurisdiction as well as those of judicial economy, convenience, and fairness to litigants. United Mine Workers of America v. Gibbs, supra, at 726, 86 S.Ct. 1130; Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148. It cannot be overlooked that the jurisdictional question here involves in a most basic and direct sense the fundamental allocation of constitutional powers.

1. The ecological question will be considered here on the subject of the injection wells, Zabel v. Tabb, 5 Cir., 430 F.2d 199, (Opinion of the Court by Chief Circuit Judge Brown), although this is not simply a case of interdepartmental federal administrative authority as augmented and directed by the National Environmental Policy Act of 1969, Public Law 91–190, 42 U.S.C.A. 4331 et seq.

a. The injection well system is authorized by permit of the Texas Water Quality Board. This permit in fact was based upon a number of factors and considerations. One was an application by the Subsurface Disposal Corporation. In addition to the feasibility study of the latter entity, there was a feasibility study by the Dow Chemical Company available and duly considered. It considered reliable information on abandoned wells in the area. The Texas Water Quality Board conducted its own investigation, reviewed its own records and had

technical authorities available to it which it consulted. The Board discussed the proposed injection well system at a public meeting on November 20, 1970. A public hearing was conducted by a hearing examiner of the Board on December 9, 1970 wherein evidence was presented in respect to the proposed injection well system.

The City of Houston by its letter dated December 2, 1970, objected to the proposed wells on the grounds that its fresh water supplies would be endangered. On December 30, 1970, the City of Houston withdrew its objections on the grounds that it was satisfied that the sysem would not contaminate the fresh water supplies of the City. This letter, signed by H. R. Normann, Assistant Director, Department of Public Works, City of Houston, states, inter alia:

"* * * The Department of Public Works now feel that, if the wells are constructed, operated and maintained as planned, and if continuous monitoring of the injection wells as well as the water supply wells in the Armco well system is maintained and reported, the proposed wells should not present any danger to the City's water supplies. Therefore, the City, now desires to withdraw its conditional objection as expressed in its letter to you on December 2, 1970".

Mr. Jerry Thornhill, now Chief of the Special Regulatory Activities of the Environmental Protection Agency, was immediately prior to accepting this position main geologist for the Board which is now the Texas Water Quality Board. Undoubtedly, that Board relied heavily upon his advice. No reason is assigned why such advice is not thoroughly reliable. In the opinion of this Court he is eminently qualified as an expert in his field. Mr. Thornhill offered no professional objection to the policy and purpose contained in the two paragraphs at page 47 of the Dow Chemical Company Feasibility Study which were read into the record and state as follows:

"Recently the Texas Water Quality Board in conjunction with the Water Development Board has required that abandoned wells within a 2½ mile radius of an industrial disposal well that are not plugged to meet current Texas Water Development Board requirements be replugged. The criteria for replugging depends upon whether or not the abandoned well penetrates the disposal zone, the amount of surface pipe in the well, the depth of the plug and the amount of cement used to make up the plug.

"Generally the Railroad Commission Statewide Rule 14, which covers plugging procedure of abandoned wells, is followed. At this time there are no documents prepared by the Texas Water Quality Board covering the exact plugging requirements of abandoned wells, but, at the time application for permit to drill is made, the Board will review the plugging records of the abandoned wells within the radius of interest and will advise the course of action to be taken on each well."

Replugging requirements by the Texas Water Quality Board in respect to the 2½ mile radius of a proposed injection well depend upon whether or not the abandoned wells penetrate the injection zone, the amount of surface pipe in the well, the depth of the plug, and the amount of cement used to make up the plug. It is clear that where the injection zone has been penetrated, the well should be plugged. The Court is of the opinion that where the Anahuac shale has been fractured by drilling there should be a replugging as it is the most effective barrier to the migration of fluid between the proposed injection zone and the fresh water sands. There is persuasive argument that any penetration below the fresh water sands should likewise be plugged.

Existing and available records disclose that there are some 18 wells which were drilled for oil or gas and abandoned as dry holes within the radius of 2½ miles from Armco's proposed injection wells. The Texas Water Quality Board has required the re-entry and replugging of 4

of the abandoned dry holes within a 2½ mile radius of the proposed injection wells which penetrated the proposed injection zone and which had not been plugged with cement below the fresh water sands. Armco agrees to this. One other well within the 2½ mile radius admittedly penetrated the fresh water zone, to-wit, the Tidewater-Houston Deep Water Land No. 1 (7487 feet deep), which Armco contends was plugged in 1944 below the fresh water sands. Thornhill recommends that it should be, if it has not already been, plugged in the Frio Sands and Anahuac shale and that the basal fresh water should be isolated. Although not satisfied as to the adequacy of total replugging of the 18 wells to protect the fresh water sands, Thornhill recommends as follows as to each of the 18 abandoned wells within the 2½ mile radius:

No. 1, Frazier, et al-Brooks Estate No. 2 (8330 feet deep). The plugging provided for by the injection well permit is inadequate. The Frio should be isolated, the Anahuac replugged, and the basal fresh water zone should be replugged.

No. 2, Stribling-Seureau No. 1 (3700 feet deep). No plugging records on file with the Texas Railroad Commission. The fresh water zone should be plugged.

No. 3, Frazier-Brooks Estate No. 1 (5618 feet deep). No plugging information on file. The well should be plugged in the Anahuac and below the fresh water zone.

No. 4, Rowntree-Greens Bayou Home Sites No. 1 (2965 feet deep). No plugging information on file. This well should be plugged below fresh water zone.

No. 5, Turnbull-Brooks Estate No. 1 (6015 feet deep). No records available. Should be plugged to isolate the Frio, the Anahuac should be replugged and it should be plugged below the basal fresh water sands.

No. 6, Seureau Drilling No. 1. No necessity for plugging.

No. 7, The Garrett Oil No. 2 (3470 feet deep). Plugging records on file. Should be plugged to protect fresh water zone.

No. 8, Garrett Oil No. 1 (3360 feet deep). No plugging records on file. Should be plugged to protect fresh water.

No. 9, Cockburn-Brooks Estate No. 2 (1) (5745 feet deep). Plugging records show an application to plug in 1936, but that no plugging report was made. The Anahuac should be replugged and the basal fresh water should be protected.

No. 10, Frazier-Jones No. 1 (6904 feet deep). This is apparently two different wells. One of the wells had a plugging application issued in 1938. Inadequate plugging is provided for by the injection well permit issued by the Texas Water Quality Board because the plugging of the Anahuac shales is not required.

No. 11, The Imperator Ordnance Depot (3000 feet deep). The fresh water zone exposed should be replugged.

No. 12, Rycade-Parker No. 1 (4050 feet deep). The fresh water zone should be plugged.

No. 13, McCormick-Greens Bayou No. 1 (6514 feet deep). No plugging records. The Frio should be isolated, the Anahuac should be replugged and the basal fresh water should be replugged and the surface should be prepared.

No. 14, Frazier-Greens Bayou No. 1 (5302 feet deep). Plugging records show the well to have been plugged with twenty sacks of cement at the bottom of the casing, 517 feet, and seven sacks at the top of the casing. The Anahuac should be replugged, the basal fresh water should be isolated and the surface should be prepared.

No. 15, Frazier-Houston Deep Water Land No. 1 (8602 feet deep). Records show this well to have been plugged in November 1946. The Frio zones should be isolated, the Anahuac should

be replugged, the basal fresh water should be isolated and the surface should be prepared. This well was represented by the deep well application as being one and the same as well listed No. 10 above. The plugging called for in the permit is inadequate.

No. 16, Tidewater-Houston Deep Water Land No. 1 (7487 feet deep). Plugging records show that this well should be plugged in the Frio and the Anahuac and that the basal fresh water should be isolated.

No. 17, Jane, et al-Jones No. 1. No necessity for plugging because depth is only 813 feet.

No. 18, The Traders Oil-Houston Deep Water Land (7349 feet deep). No plugging records available. Plugging is provided for by the Texas Water Quality Board in the injection well permit, but the requirements are not adequate to protect fresh water. The well should be plugged to isolate the Frio, the Anahuac should be replugged and the basal fresh water should be plugged.

The plethora of complex technical evidence on the subject is to the effect that within the next decade there would be no horizontal migration of the injected fluid either to or beyond the periphery of the 2½ mile radius. (Armco avows that it will not continue the process beyond that period of time.) This accounts for the nature and porosity of the Frio sands and the pressure that will be applied to that formation by the injection operations. There is scientific proof to the effect that once the injection operations cease the injected fluids will remain stationary. Plaintiff dwells upon the geological uncertainties and the magnitude of the human risks involved. A more plausible argument than the possibility of earthquake in this geographical area is the possibility of old oil and gas wells in the area on which there are no records. But the Texas Railroad Commission records are manifestly good and go back in thoroughness well into the 1930's. What is more than reasonable to assume is that wells of any earlier vintage were not drilled to such a depth as would leave a conduit from the Frio sands here to the fresh water sands. It is reasonable to assume that any fractures of that kind within a limited geographical area could be, or would have been, detected and located by scientific methods. A question that might well arise, but not touched upon by this record, would be the effect of any possible future exploration for oil and gas in the area. But this cannot concern, or be controlled, by this Court here.

A Court of equity is a court of conscience but not of omniscience—be it assumed or suggested from without. It is one thing, upon a recognizable statutory basis, to enjoin the continued obstructive pollution of a navigable waterway at the instance, long quiescent, of the Executive power. It is another matter to purport to affirmatively direct the industry in question as to what it must do. If the effective invocation of Section 13 as to the Channel otherwise opens Pandora's Box as to adjacent subsurface, it is the doing of the Plaintiff not of the Court. Nor is this Court unmindful that the ecological movement of the day can lend itself to participation by extremists who are indifferent, or even inimical, to those industrial and economic realities which are vital to the life of the nation.

The Plaintiff suggests and Armco here has considered, other methods of disposing of the deleterious industrial wastes. These include the technique of incineration and flaring; the installation of an ammonium production unit with a biological treatment plant and a chemical oxidation facility; the elimination of the noxious effluents from outfall No. 9/2, blast furnace scrubber water, by using it to quench the slag produced by the furnace.

The Court was particularly impressed with the testimony of the Plaintiff's witness, Henry C. Bramer, President of Datagraphics, Incorporated, of Pittsburgh, Pennsylvania. For upward twenty years Bramer's major field of activity has been in the area of steel industry pollution problems. This began

with his association with the Mellon Institute in Pittsburgh and an affiliate group sponsored by the American Iron and Steel Institute. He testified without contradiction that he has participated in forty (40) or fifty (50) projects relevant to the steel industry pollution question. Bramer testified, and the details of his testimony are persuasive, that of particular relevance here is a three year pilot project developed at the Crucible Steel Company, Midland, Pennsylvania. The project concerned the co-treatment of spent liquor (nonintoxicating) and coke oven gas. Such a system includes recourse to flaring and incineration. A like system has been operated by the Bethlehem Steel Plant at Bethlehem, Pennsylvania. It is not dissimilar to systems operated by Armco itself at its Middletown and Hamilton, Ohio plants. No other reason is assigned by Armco why the citizens of Ohio should be given more favorable treatment than citizens of Texas. This system recommended by Bramer is comparable to one recognized by Armco's own witness, Mr. Ron Thompson. It is a matter of admission in the record that Armco's objection to the alternative incineration method is the matter of costs. Apart from the time factor and interest on the required initial investment, the record discloses that the cost difference over a ten year period does not appear to be that great: the cost on the incineration system over a ten year period would be $3,850,000.00; the cost of the injection well system over a ten year period would be $3,300,000.00. Indications are that in practice the economic cost difference between the two systems would be even less. Assuming the accuracy of these estimates, the difference to the Court seems small indeed compared to the company good will that can be involved where the incineration method has been employed and accepted at its other places and injection, in this area, could pose a serious danger to the lives of countless numbers of people. Nor is the record clear that an incineration method which Armco has found efficacious and acceptable at its certain other locations would violate air purity standards locally.

■ It is not, however, by any means within the province of this Court to affirmatively direct or compel any one method of treating or disposing of the deleterious industrial wastes in this case. This Court is controlled in this case by established principles of equity jurisprudence. It cannot rule on the basis of what may or may not be the principal purpose of the Plaintiff in this litigation.

Accordingly, the Petition for injunction will be granted to the following extent only:

1) Armco will cease and desist immediately from discharging all cyanides, phenols, sulfides and ammonia and other toxic pollutants into the Houston Ship Channel from its outfalls numbers 11, 9/2, 9/1 and 5/6.

2) Armco is further enjoined from disposing of the toxic industrial wastes in question by means of their proposed injection well system unless and until such time as the recommendations of Mr. Jerry Thornhill, Chief of the Special Regulatory Activities of the Environmental Protection Agency, in respect to the eighteen (18) abandoned oil and gas wells within a two and one-half (2½) mile radius of the proposed injection wells are complied with.

3) Third party defendants William D. Ruckelshaus' and John M. Mitchell's Motion to Dismiss Counter Claim and Third Party Claim against Plaintiff is granted. Third party defendants' Motion to Strike and Dismiss Complaint against State is denied. Third party Defendants, Fulcher, et al, Motion to Strike and Dismiss Third Party Claim is denied. The Court has not unconditionally enjoined use of the injection well system by Armco. The Court has placed a condition precedent to recourse by Armco to the injection well system, to-wit, prior compliance with the recommendations of Mr. Jerry Thornhill concerning plugging and treatment of the eighteen (18) abandoned oil and gas wells within a two and one-half (2½) mile radius of the proposed injec-

tion well system as reflected by Thornhill's recommendations cited at pages 14–15 herein. Defendant Armco Steel Corporation's Motion to Dismiss is denied.

4) The Court will retain jurisdiction of this cause for purposes of determining if there has been fair and adequate compliance with the mentioned recommendations of Mr. Thornhill all of which is a condition precedent to any recourse by Armco to the use of the injection well system as a means of disposing of the toxic wastes in question.

5) The parties may submit a formal order consistent with the foregoing rulings. Court costs will be charged to Armco.

The foregoing constitutes Findings of Fact and Conclusions of Law herein. Any Finding of Fact hereinabove made which also constitutes a Conclusion of Law is adopted as a Conclusion of Law. Any Conclusion of Law herein made which also constitutes a Finding of Fact is hereby adopted as a Finding of Fact.