**UNITED STATES of America**

v.

**ROHM & HAAS COMPANY.**

**Civ. A. No. 71-H-792.**

United States District Court,
S. D. Texas,
Houston Division.

Jan. 31, 1973.

Anthony J. P. Farris, U. S. Atty., Jack Shepherd, Chief Asst. U. S. Atty., B. Stephen Rice, Asst. U. S. Atty., Houston, Tex., John Hills, Dept. of Justice, Washington, D. C., for plaintiff.

B. D. McKinney, Baker & Botts, Houston, Tex., for defendant.

## FINAL ORDER

SINGLETON, District Judge.

This civil action is filed by the plaintiff to enjoin defendant from discharging refuse materials from its Houston plant into the Houston Ship Channel in violation of 33 U.S.C. § 407 [commonly known as the Refuse Act]. The plaintiff urges its claimed remedies under authority of 33 U.S.C. § 413. This court has jurisdiction of the subject matter under 28 U.S.C. § 1345 and its traditional equity jurisdiction.

■ It must be stated at the outset that the defendant cannot claim the protection of Section 402(k) of the Federal Water Pollution Control Act of 1972, 86 Stat. 816. Section 4 of that Act is a savings provision which defeats any attempt by the defendant to abate these proceedings.

■ Nor will the defendant be protected under equity concepts because it had applied for a permit from the Chief of Engineers.

■ It is undisputed that the Houston Ship Channel is a navigable water within the meaning of the relevant act. After reviewing a considerable quantity of expert testimony given in this case, this court concludes that the Rohm and Haas Company's Deer Park plant on the Houston Ship Channel is in violation of the Refuse Act by discharging "refuse matter" within the meaning of 33 U.S.C. § 407 in that said plant has been and is discharging effluent wastes through separate outflows on a daily and continuous basis into the waters of the Houston Ship Channel. Said effluent wastes contain significant quantities of ammonia, chromium, cyanide, phenols, zinc, cadmium, iron, manganese, copper, nickel, lead sulfides, mercury, silver, fluorides, grease and oil, suspended solids, organic nitrogen, surfactants, acrylic monomers and polymers, alcohols, ethanol, iso-butanol, N-Butanol, COD, BOD, suspended solids, and other materials which remain unidentified. *See* United States v. Armco Steel Corp., 333 F.Supp. 1073 (S.D.Texas 1971) and cases cited therein. Such a violation is remediable by injunction.

■ This court is not unmindful of the defendant's own extensive research and investigations in an attempt to reduce its discharge of harmful effluents. It is not within the province of this court to direct or compel any one method of treating the deleterious wastes. Also, this court is hesitant to attempt to establish measurement standards relating to the harmful effluents discharged by Rohm and Haas into the Houston Ship Channel. However during the course of this trial, experts representing both the Government and Rohm and Haas gave testimony in detail relating to measurement standards in an attempt to aid this court in constructing a workable timetable and to establish such standards. This court recognizes that as the problem of discharge of harmful effluents into the Houston Ship Channel receives more and more study and attention, some one governmental agency, either federal, state, county, or city will more than likely establish other and better standards; but, until such is accomplished, this court is certain that it cannot escape its obligation and responsibility in this respect. Parenthetically, this court believes that some *one* agency could and should be established not only to set standards in these respects but to have the power to seek, through the courts, compliance therewith. The judges of the various courts, including the judge of this court, do not possess the technical expertise necessary to wisely establish pollutant criteria. However, with all of this in mind, the court has concluded that the defendant should be and is hereby permanently enjoined from allowing quantities of the following substances to be placed in the Houston Ship Channel in excess of the amounts set out below on the dates set forth:

## AMMONIA

By 4/1/73 no more than 7,563 pounds per day.

By 7/1/73 no more than 5,563 pounds per day.

By 7/1/74 no more than 1,350 pounds per day.

By 12/31/74 no more than 405 pounds per day.

## CHEMICAL OXYGEN DEMAND (COD)

By 7/1/73 not to exceed 6,400 pounds per day.

By 12/31/74 not to exceed 2,700 pounds per day.

## TOTAL CYANIDE

By 2/1/73 no more than 23 pounds per day, with no more than 2.5 pounds per day to be free cyanide.

## TOTAL CHROMIUM

By 4/1/73 no more than 50 pounds per day.

By 12/31/73 no more than 5 pounds per day total chromium, zero hexavalent chromium.

## NICKEL

By 7/1/73 no more than 130 pounds per day.

By 12/31/73 no more than 81 pounds per day.

## TOTAL SUSPENDED SOLIDS (TSS)

By 7/31/73 no more than 1,250 pounds per day.

By 12/31/73 no more than 1,080 pounds per day.

## VOLATILE SUSPENDED SOLIDS (VSS)

By 2/1/73 no more than 1,000 pounds per day.

By 12/31/73 no more than 800 pounds per day.

## BIOCHEMICAL OXYGEN DEMAND (BOD₅)

By 7/1/73 no more than 900 pounds per day.

By 12/31/73 no more than 470 pounds per day.

## OIL AND GREASE

After the date of this judgment, no free or floating oil or grease.

## BARGING TO SEA OF UNTREATED WASTE AND MOTHER LIQUORS

None after the date of this judgment.

The following standards are included as a part of this order as agreed to by the parties in a pretrial stipulation:

1. The total discharge of mercury as mercury, as analyzed by the cool vapor atomic absorption method, shall not exceed a maximum of 0.1 pounds per day.

2. The discharge of phenols, as defined and analyzed in *Standard Methods for the Examination of Waters and Waste Waters,* 13th Edition, shall not exceed an average of 1.2 pounds per day during any thirty day period.

3. The discharge of sulfides, as defined and analyzed by *Standard Methods for the Examination of Waters and Waste Waters,* 13th Edition, shall not exceed an average of 5.0 pounds per day during any thirty day period.

4. Defendant's discharge of waste materials by injection into its deep well facility located at Deer Park shall not be increased or altered, and only its ammonium sulfate cooling tower water shall be so injected. The standard by which such increase or alteration shall be measured is defendant's representations of present injection well use as set forth in Government Exhibit 19, containing "Specified Interrogatories and Defendant's Answers Thereto," specifically questions and answers numbered 34 and 35:

"34. State whether the company disposes of any of its effluent by

(a) Deep well disposal.

Ans. (a) Yes.

"35. If the answer to 34(a) or (b) is yes, state with regard to each.

\*    \*    \*    \*    \*    \*

(c) The chemical composition of the waste.

\*    \*    \*    \*    \*    \*

Ans. (c) Ammonium Sulfate Cooling Tower Water (disposed of by Deep Well Injection).

*Typical Composition*

| | | |
|---|---:|---|
| Total hardness (as $CaCO_3$) | 17.5 | mg/L |
| Sodium, Na $+$ | 2,603.6 | mg/L |
| Calcium, Ca $++$ | 7.0 | mg/L |
| Magnesium, Mg $++$ | 0 | |
| Iron (Total, Fe $++$) | 3.0 | mg/L |
| Total Alkalinity (as $CaCO_3$) | 5,300 | mg/L |
| Chloride, Cl | 269.5 | mg/L |
| Sulfate, $SO_4 =$ | 5 | mg/L |
| Carbonate, $CO_3 =$ | 6,466.0 | mg/L |
| Hydroxide, OH | 0 | |
| Sulfide, S $=$ | 0 | |
| Chromate, $Na_2\ CrO_4$ | 500 | mg/L |
| Oxygen, $O_2$ | 5 | mg/L |
| Total Dissolved Solids (calculated) | 9,354.1 | mg/L |
| COD * | 25,000 | mg/L |
| $NH_3$ | 27,800 | mg/L |

* COD consists of various alcohols and methacrylate monomers."

Upon each of the dates outlined above, the parties will provide samples for measuring each of the wastes in question to the Environmental Protection Agency, Region VI, Houston Laboratory, and receive their evaluation of the quantities present in the samples. The parties will then report to the court if necessary.

This court will retain jurisdiction of this cause until the guidelines set out have been complied with.